**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**AT CHARLESTON**

UNITED STATES OF AMERICA

v. CRIMINAL ACTION NO. 2:24-cr-00037

SHAWN R. BLANKENSHIP

# MEMORANDUM OPINION AND ORDER

On June 1, 2026, the Court directed the parties to submit cross briefs on the following issues:

1. Whether Defendant Shawn R. Blankenship's alleged add-on billing claims for smoking cessation and obesity counseling, even if fraudulent, constitute relevant conduct under U.S.S.G. § 1B1.3;
2. Whether the $137,543.23 in alleged fraudulent claims for services rendered by providers other than Mr. Blankenship are nonetheless attributable to him under U.S.S.G. § 1B1.3(a)(1)(B); and
3. Whether the Government's "cloned-notes" billing theory -- supported only by the use of templated language in the billing notes -- is *per se* fraudulent conduct sufficient to establish that the reported services were not rendered.

[ECF 243 at 1]. These issues form the basis of Mr. Blankenship's principal objections to the Presentence Investigation Report ("PSR") and the Government's position respecting the proper

enhancement to his base offense level that determines the applicable loss amount. *See* U.S.S.G. § 2B1.1.[1] On June 15, 2026, the parties submitted their cross briefs [ECF 244, 245] as directed.

**I.**

***A. The Charges & Offenses of Conviction***

Mr. Blankenship is a certified nurse practitioner and the owner of Holistic, Inc., ("Holistic"), a health care clinic that provides, *inter alia*, substance abuse treatment, weight loss services, and holistic medical care for patients. [ECF 196]. On September 17, 2024, the Grand Jury returned a twenty-five (25) count Superseding Indictment against Mr. Blankenship, charging him with (1) one count of conspiracy to commit health care fraud, (2) sixteen counts of health care fraud, (3) five counts of causing the illegal use of another's DEA registration number to dispense controlled substances, and (4) three counts of engaging in monetary transactions with funds derived from unlawful activity. [ECF 74]. The charges arise from Mr. Blankenship's alleged perpetration of a three-and-a-half-year-long scheme to defraud Medicaid by submitting false claims through Holistic for unrendered or unnecessary medical services. [*See id.* at ¶ 17]. Paragraphs 18-20 of the Superseding Indictment set forth the "purpose" and the "manner and means" of the alleged conspiracy as follows:

<u>The Purpose of the Conspiracy</u>

> 18. The purpose of the conspiracy was for Shawn R. Blankenship and his co-conspirators to unlawfully enrich themselves by, among other things: (a) directing and causing a non-licensed Holistic office staff member to see patients at Holistic while no licensed medical professionals were present at Holistic; (b) directing and

---

[1] Mr. Blankenship was originally scheduled to be sentenced in October 2025. The PSR and the parties thus used the 2024 Guidelines Manual to calculate Mr. Blankenship's offense level and corresponding guideline range at the time of their original submissions. *See* U.S.S.G. § 1B1.11(a). The guidelines, however, have since been amended, effective November 1, 2026. This includes substantive amendments to § 2B1.1, all of which are to Mr. Blankenship's advantage. The Court will thus use the calculations produced under the 2026 Guidelines Manual in framing the parties' contentions and arriving at the proper calculations.

causing a non-licensed Holistic office staff member to issue prescriptions for controlled substances, including Suboxone and phentermine, in the name of Shawn R. Blankenship or another Holistic licensed professional, to patients of Holistic while no licensed medical professionals were present at Holistic; (c) submitting and causing the submission of false and fraudulent claims to Medicaid for services that were not provided, including but not limited to (i) patient office visits and other services while Shawn R. Blankenship and all other licensed medical professionals employed by Holistic were on vacation outside the State of West Virginia, (ii) smoking and tobacco use cessation counseling visits, and (iii) preventative obesity counseling; (d) falsifying patient records to make it appear as though defendant Shawn R. Blankenship performed office visits and provided other services to patients at Holistic when he, in fact, did not; (e) submitting and causing the submission of false and fraudulent claims to Medicaid for services that were not medically necessary, to wit, pregnancy tests for patients who had no ability to become pregnant due to prior medical procedures; and (f) delivering fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

The Manner and Means of the Conspiracy

19. The manner and means by which Shawn R. Blankenship and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

a. From on or about October 28, 2020, through on or about October 30, 2020, Shawn R. Blankenship, along with the two other nurse practitioners employed at Holistic, traveled to Hilton Head, South Carolina. While Shawn R. Blankenship was in South Carolina, Holistic remained open and patients were seen by non-licensed Holistic staff.

b. Shawn R. Blankenship knowingly and intentionally submitted and caused the submission of claims to Medicaid for patient services that were not in fact performed on or about October 28, 2020, through on or about October 30, 2020. These services included, but were not limited to, claims for established patient office visits (CPT code 99213), by a qualified health care professional.

c. At Shawn R. Blankenship's direction, prescriptions for controlled substances were issued to patients at Holistic by non-licensed Holistic office staff under either Shawn R. Blankenship's, or another licensed nurse practitioner's, DEA registration number on or about October 28, 2020, through on or about October 30, 2020.

d. Shawn R. Blankenship falsely signed electronic medical records in or around November 2020 for patients seen by non-licensed Holistic office staff on or about October 28, 2020, through on or about October 30, 2020.

> e. Between approximately on or about January 4, 2018, and on or about July 15, 2021, Shawn R. Blankenship knowingly and intentionally submitted and caused the submission of claims to Medicaid for purported smoking and tobacco use cessation counseling visits that were not in fact provided. This included, but was not limited to, billing Medicaid for smoking and tobacco use cessation counseling visits for patients who did not smoke or use tobacco.
>
> f. Between approximately on or about January 4, 2018, and on or about July 15, 2021, Shawn R. Blankenship knowingly and intentionally submitted and caused the submission of claims to Medicaid for purported preventative obesity counseling visits that were not in fact provided.
>
> g. Between approximately in or about January 4, 2018, and in or about July 15, 2021, Shawn R. Blankenship knowingly and intentionally submitted and caused the submission of claims to Medicaid for unnecessary pregnancy testing, including testing for patients who had undergone tubal ligation surgery and repeated testing for patients who were in the later stages of pregnancy.
>
> 20. As a result of the conspiracy, Shawn R. Blankenship and his co-conspirators submitted and caused the submission of approximately $6.7 million in false and fraudulent claims to Medicaid of which approximately $600,000 was paid.

[*Id*. at ¶¶ 18-20].

On March 19, 2025, Mr. Blankenship pled guilty to four (4) counts of health care fraud, in violation of 18 U.S.C. § 1347, as charged in Counts 8, 10, 11, and 12 of the Superseding Indictment, sometimes referred to as the "Beach Trip Claims." [ECF 174]. The specific conduct comprising the offenses of conviction consists of Mr. Blankenship's submission of claims to Medicaid for unrendered medical services while he and Holistic's other two nurse practitioners were vacationing in Hilton Head. The Stipulation of Facts attached to Mr. Blankenship's Plea Agreement pertinently provides as follows:

> From on or about October 28, 2020, through on or about October 30, 2020, I and the other licensed nurse practitioners working at Holistic traveled to Hilton Head, South Carolina, while Holistic remained open. I knowingly and intentionally submitted and caused the submission of claims to Medicaid for services that were not in fact performed on those dates.
>
> Specifically, I caused the submission of the following bills to Medicaid and its Managed Care Organizations with the intent to receive payment for medical services, while knowing the bills to be inaccurate. I knowingly and willfully caused

> the submission of (1) claim 20307E0050738 for Smoking Cessation Services purportedly conducted on October 29, 2020, under CPT Code 99406 for a patient with the initials S.A.; (2) claim 20307E0050876 for Smoking Cessation Services purportedly conducted on October 29, 2020, under CPT Code 99406 for a patient with the initials J.Y.; (3) claim 20307E0050871 for a 15-minute Office Outpatient Visit purportedly conducted on October 29, 2020, under CPT Code 99213, for a patient with the initials S.W.; and (4) claim 20307E0050871 for Smoking Cessation Services purportedly conducted on October 29, 2020, under CPT Code 99406 for a patient with the initials S.W. I submitted the foregoing claims while knowing that such services were not conducted because all licensed nurse practitioners were out of state.
>
> The United States believes that the loss amount for relevant conduct attributable to Mr. Blankenship is approximately $600,000 and Mr. Blankenship believes that number to be lower. The parties have no other agreement as to the loss amount for the relevant conduct attributable to Mr. Blankenship and will present their evidence and arguments in support of their respective positions at sentencing.

[ECF 173 at 12-13].

Upon receipt of Probation's PSR and the parties' sentencing memoranda [ECF 195, 196], the Court converted the then-scheduled sentencing hearing into an evidentiary hearing, considering the numerous outstanding objections related to (1) the relevant conduct encompassed by the offenses of conviction, (2) the proper calculation of the loss amount attributable to Mr. Blankenship, and (3) the Government's ability to prove its asserted loss amount. [ECF 197, 202]. To illustrate the glaring disconnect and the evolution of the Government's position overtime, it is helpful to set forth the parties' initial contentions.

### *B. The Parties' Initial Contentions*

First, the PSR calculated the total intended loss as $1,759,511.29, arising from the 41,977 claims submitted to Medicaid by Mr. Blankenship and Holistic from January 4, 2018, through July 15, 2021, for medical services that were purportedly never rendered and unnecessary. The PSR's intended loss figure included (1) $16,923 in billed claims for nurse practitioner services between October 28, 2020, and October 31, 2020, during the Hilton Head trip, (2) $20,948.29 in

billed claims for Suboxone prescriptions during this same time period when no nurse practitioners were present at Holistic, (3) $924,752 in billed claims for obesity counseling between January 4, 2018, and July 15, 2021, "where the patient had no primary diagnosis of obesity or similar diagnosis," rendering the same medically unnecessary, and (4) $796,888 in claims billed for smoking cessation counseling during this same three-year period "where the patient had no record of smoking," likewise rendering the same unnecessary. [PSR at ¶¶ 21-26].

Though the PSR recognized Medicaid only paid a total of $604,189.66 for the $1,759,511.29 in claims originally billed, it utilized the intended loss amount to calculate the applicable enhancement to Mr. Blankenship's base offense level under U.S.S.G. § 2B1.1(b)(1) inasmuch as it was the greater of the two amounts. *See* U.S.S.G. § 2B1.1(b)(A) (defining "loss" as "the greater of actual loss or intended loss."). The $1,759,511.29 intended loss amount resulted in a 14-level enhancement to the undisputed base offense level of 6 under § 2B1.1(b)(1)(H), producing an adjusted offense level of 20.[2] Accounting for (1) the undisputed 2-point abuse of trust enhancement under § 3B1.3, (2) a 2-level reduction for acceptance of responsibility under § 3E1.1(a),[3] and (3) a 2-level reduction for zero-point offender status under § 4C1.1(a), the PSR calculated the total offense level at 18. A total offense level of 18 and a Criminal History Category of I, yielded a guideline range of 27-33 months imprisonment.

---

[2] Under the 2024 Guidelines Manual, the PSR's calculated intended loss amount would have resulted in a sixteen-level increase under § 2B1.1(b)(1)(I) and an adjusted offense level of 22. *Compare* U.S.S.G. § 2B1.1(b)(1)(I) (2024) (requiring a sixteen-level increase if the loss is more than $1,500,000 but less than $3,500,000) *with* § 2B1.1 (2026) (requiring a fourteen-level increase if the loss is more than $750,000 but less than $2,000,000).

[3] The PSR did not include the additional 1-point reduction under § 3E1.1(b), given the Government's refusal to so move for it. That refusal arose out of its assertion Mr. Blankenship unseasonably decided to take a guilty plea.

The Government did not object to the PSR's calculations. It did, however, state its intention to stand by the parties' plea agreement and recommend resort to the actual, not the intended, loss amount of $604,189.66. [ECF 195 at 7 n.7]. It agreed with the PSR that the offenses of conviction encompassed the entirety of Mr. Blankenship's purportedly fraudulent conduct spanning from January 2019 through July 2021, sometimes referred to as the "Overall Scheme" or "add-on" claims. [*Id*. at 3 ("The applicable loss amount should not be limited to claims from the single October 2020 beach trip. Defendant's offense conduct includes the Overall Scheme Claims, which includes claims for purported additional services paid by Medicaid . . . for tobacco counseling and obesity counseling (for non-weight-loss beneficiaries), in addition to the Beach Trip Claims.")].

At the time the PSR was drafted, the Government's primary fraud theory respecting the add-on claims appeared to be they were medically unnecessary because the services were provided to patients with no established history of smoking or diagnosis of obesity. [*Id*.]. This theory stood in stark contrast to how the add-on claims were initially charged and characterized in the Superseding Indictment, namely, that they were fraudulent because they were submitted claims for unrendered services.[4] [*See* ECF 74 at ¶¶ 18-19]. After Mr. Blankenship challenged the Government's medical necessity theory, the Government began to deviate from its original position in its sentencing memorandum, providing an alternative theory to support the fraudulent nature of the smoking and obesity counseling claims:

> The [G]overnment will present testimony at sentencing to establish that tobacco cessation counseling and obesity counseling at the frequency Defendant was

[4] The only claims the Superseding Indictment specifically charged as medically unnecessary were those submitted for pregnancy testing "for patients who had undergone tubal ligation surgery and repeated testing for patients who were in the later stages of pregnancy." [ECF 74 at ¶ 19(e)]. The Government has nevertheless agreed to remove those claims from the loss calculation.

> claiming from Medicaid was not provided and not medically necessary in the manner it was purportedly provided. The [G]overment will present testimony and evidence to show that Defendant attempted to support his rote and fraudulent practice of adding upcoded charges for smoking cessation and obesity counseling by inputting and causing the input of identical notes, i.e., cloned notes that lack any indication of actual individualized assessment and diagnosis, in Holistic's medical records for the beneficiaries. Such lack of individualized care fails to support the medical necessity for these fraudulent claims and thus those claims are non-covered claims, ineligible for Medicaid reimbursement.

[ECF 195 at 5]. The Government then provided the following breakdown, in chart-form, of its calculated loss amount:

| | |
|---|---|
| Claims for Nurse Practitioner Services During Beach Trip (no Nurse Practitioner Present): | $7,515.96 |
| Claims for New Prescriptions Issued Without Individualized Assessment of Need by DEA Registrant: | $13,784.70 |
| Obesity Counseling Claims Jan. 4, 2018-July 15, 2021, for Patients with No Primary Diagnosis of Obesity or Similar Diagnosis: | $353,311.59 |
| Smoking Cessation Claims Jan. 4, 2018-July 15, 2021: | $229,577.41 |
| **TOTAL** | **$604,189.66** |

[*Id*. at 6].

Based on its calculated loss, the Government contended Mr. Blankenship's base offense level of 6 warranted a 12-level enhancement under § 2B1.1(b)(1)(G) inasmuch as the actual loss amount was greater than $350,000 but less than $750,000, producing an adjusted offense level of 18. Accounting for all the undisputed enhancements and reductions applied in the PSR, the Government calculated the total offense level at 16. A total offense level of 16 and a Criminal History Category of I, yielded a guideline range of 21-27 months imprisonment.

Mr. Blankenship calculated a drastically lower loss amount and lodged numerous objections to the PSR. [ECF 196]. Reduced to its essence, in his sentencing memorandum, Mr. Blankenship maintained the loss amount is confined to the $7,515.96 arising from the conduct to which he pled guilty, namely, "submitting [fraudulent] claims for *services not rendered* during the three-day period in October 2020 when there were no medical professionals at Holistic . . ." [*Id*.

at 5 (emphasis in original)]. Simply put, he asserted his offenses of conviction are limited to fraudulent conduct by way of unrendered services. [*Id*. at 5-7]. He insists he must not be held responsible for the alleged conduct pertaining to the smoking cessation and obesity counseling services the Government asserted -- for the first time -- was either medically unnecessary or inherently fraudulent due to overutilization. [*Id*.].

In so doing, Mr. Blankenship emphasized that, in the Superseding Indictment, the Government characterized and charged the smoking cessation and obesity counseling claims as fraudulent because they were bills for unrendered services, rather than medically unnecessary. [*Id*. at 6; *see also* ECF 75 at ¶¶ 18(c)(ii)-(iii), 19(e)-(f)]. He asserted the Government then changed course by "unilaterally shift[ing] to a novel 'medical necessity' theory that is not plausibly part of the same 'course of conduct' or scheme as the Hilton Head bills[,]" after "Mr. Blankenship illustrated that the [smoking cessation and obesity counseling] services were, in fact, rendered[.]" [*Id*. at 6]. At bottom, he maintained (1) the claims submitted for smoking and obesity counseling services are not relevant conduct encompassed by his offenses of conviction, (2) even assuming they were, the Government lacked the necessary evidence to prove its fraudulent theory related to those services, and (3) the only loss amount reliably supported by the evidence is the $7,515.96 billed for unrendered services during the Hilton Head trip, rendering him eligible for a probationary sentence.[5]

---

[5] Mr. Blankenship has also consistently maintained the $13,784.70 in claims billed for Suboxone prescriptions called in by Mr. Blankenship's agent during the Hilton Head trip are not fraudulent under the Controlled Substance Act and its implementing regulations. He thus excludes those claims from his total loss calculation.

### *C. The Evidentiary Hearing & Ordered Submissions*

On October 1, 2025, the Court convened for an evidentiary hearing to address the voluminous and complex record related to the proper calculation of the loss amount. For approximately two hours, the Court heard testimony from the Government's expert witness Dr. Kevin McCann, Director of West Virginia Medicaid. [*See* ECF 210]. At the conclusion of Dr. McCann's testimony, the Court peremptorily adjourned the hearing after it became apparent "that the parties' approach would be of little to no assistance in making the required findings," concerning the appropriate loss amount. [ECF 207]. This was so inasmuch as Dr. McCann (1) essentially rejected the Government's primary fraud theory, and (2) admitted to reviewing only nine of the thousands of patient records at issue. [*See* ECF 210 at 50:24-51:12, 59:9-16].

On October 6, 2026, the Court entered an Order that directed the parties to submit, in a particularized format, the entirety of the billing records upon which the Government's proposed loss calculation was based, accompanied by the parties' positions explaining why the loss amount attributable to each patient's billing constituted an unlawful or proper request for reimbursement. [*Id.*]. The Government's first submission failed to comply with the Court's instructions. [*See* ECF 217]. The Court thus ordered the Government "to start its submission anew and supply the requisite, individualized, patient-specific information identified in the Court's October 6, 2025, Order." [*Id.* at 2].

On April 27, 2026, after numerous extensions, the Court received the parties' consolidated submission. [*See* ECF 239, 241, 242]. That material spans over 100,000 pages. Upon conducting the individualized accounting directed by the Court, the Government again shifted its position related to the fraudulent nature of the add-on claims. Indeed, the Government now asserts the total loss amount attributable to Mr. Blankenship is $437,511.49, which includes the

$21,300.66 in claims billed for unrendered services and Suboxone prescriptions during the Hilton Head trip and $416,210.83 in add-on smoking and obesity counseling claims billed during the entirety of the alleged fraudulent scheme. [ECF 244 at 7]. The Government now separates the $416,210.83 in add-on claims into two purportedly fraudulent categories: (1) claims billed for smoking or obesity counseling "where the only support was a copied and pasted template or cloned note that lacked any indication to show an individualized interaction even addressed the topic in question," (hereinafter "cloned-note claims"), and, for the first time, (2) claims billed for smoking and obesity counseling "for which there was . . . no reference in the patient's [electronic] medical record [("EMR")] relating to the add-on counseling services," (hereinafter "no-note claims"). [ECF 227 at 9]. The Government asserts the no-note claims are comprised of two types: (1) where the EMR showed an office visit occurred on the date the add-on service was billed but contained no note indicating that smoking or obesity counseling was provided, and (2) where the EMR showed no indication of an office visit with a nurse practitioner on the date the add-on claim was purportedly provided and billed. [*Id*. at 4-5].

Mr. Blankenship, however, reasserts his initial positions respecting relevant conduct and maintains the total loss amount attributable to him is $7,515.96 for the claims billed during the Hilton Head trip, exclusive of the $13,784.70 in claims billed for Suboxone prescriptions during that same period. [ECF 239 at 8]. Specifically, even if deemed fraudulent, Mr. Blankenship maintains the add-on claims are outside the scope of his attributable, relevant conduct. Specifically, he asserts the course of conduct comprising his offenses of conviction is "billing for services which were not rendered, because no licensed medical provider was present." [ECF 245 at 4]. He contends the Government's cloned-note and no-note theories lack the requisite connection to that course of conduct inasmuch as those claims encompass "days when providers

were indisputably in the office, seeing patients, and billing for legitimate medical treatment." [*Id*.]. He thus maintains the Government's theories respecting the add-on claims are "so distinct [from the offense conduct] that [the add-on claims] cannot be considered [as] part of the same course of conduct, or common plan or scheme." [*Id*.].

He further contends even if the $416,210.83 in add-on claims constitutes relevant conduct, the Government cannot prove those claims were fraudulent. [ECF 239 at 4-6]. Respecting the cloned-note claims, Mr. Blankenship asserts there is nothing inherently fraudulent about the use of templated language in an EMR, as recognized by the American Medical Association ("AMA"). [*Id*. at 5]. He also emphasizes the Government's own expert conceded cloned notes are not *per se* fraudulent, absent some other evidence demonstrating (1) the services were not actually rendered, or (2) the patients at issue lacked the requisite obesity or smoking diagnosis; an argument the Government initially raised but has since abandoned. [*Id*. at 5-6].

Respecting the no-note claims, Mr. Blankenship does not dispute many of the patient records lack a reference to smoking and obesity counseling in the patient EMR. [*Id*. at 7]. Nevertheless, he asserts the separate, handwritten fee tickets[6] accompanying many of those records on the dates in question document and demonstrate the services were provided, despite the absence of a notation in the EMR. [*Id*.]. Mr. Blankenship thus maintains "because [he] has submitted handwritten fee tickets to corroborate the services provided, the 'no[-]note' loss category must be disregarded." [*Id*. at 7].

---

[6] In his objections to the PSR, Mr. Blankenship described a fee ticket as "a single sheet of paper filled out by hand by multiple staff members to circle medical billing codes which correspond to the services rendered during a visit. A fee ticket is entirely distinct from a Progress Note, which is created within a patient's E[M]R and electronically signed by the provider who saw the patient." [PSR Addendum at 41, n.13].

As previously mentioned, on June 1, 2026, the parties were directed to submit cross briefs on the following issues: (1) whether the $416,210.83 in add-on claims for smoking and obesity counseling constitute relevant conduct to his offenses of conviction under U.S.S.G. § 1B1.3, (2) whether the $137,543.23 in claims for services rendered by providers other than Mr. Blankenship are attributable to him under U.S.S.G. § 1B1.3(a)(1)(B), and (3) whether the use of cloned notes is *per se* fraudulent conduct sufficient to establish that the billed services were not rendered. The Court addresses those issues below.

**II.**

***A. Fraudulent Nature of the Add-On Claims***

"Courts determine a defendant's offense level based on 'all 'relevant conduct' in which the defendant was engaged and not just with regard to the conduct underlying the offense of conviction.'" *United States v. Covington*, 180 F.4th 576, 594 (4th Cir. 2026) (quoting *Witte v. United States*, 515 U.S. 389, 393 (1995) (quoting U.S.S.G. § 1B1.3)). Indeed, "[i]n broadly defining the relevant conduct to be considered in determining the offense level, the Guidelines direct that the court consider 'all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant' and those acts and omissions undertaken by coconspirators that are 'within the scope of the jointly undertaken activity,' 'in furtherance of that criminal activity,' and 'reasonably foreseeable.'" *United States v. Elbaz*, 54 F.4th 593, 609 (4th Cir. 2022) (quoting U.S.S.G. § 1B1.3(a)(1)). Additionally, for specific offenses, including those at issue here, the Court considers those acts described above "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).

Nevertheless, "[d]espite § 1B1.3's broad language," the United States Court of Appeals for the Fourth Circuit has made clear "'that relevant conduct under the Guidelines must be criminal conduct'" to be attributable. *Elbaz*, 54 F.4th at 609 (quoting *United States v. Dove*, 247 F.3d 152, 155 (4th Cir. 2001)). Simply put, if the Government cannot prove by a preponderance of the evidence that the add-on claims it seeks to attribute to Mr. Blankenship are fraudulent, those claims cannot constitute relevant conduct used to increase the loss amount beyond the offenses of conviction. *See United States v. Monroe*, 156 F. App'x 543, 544 (4th Cir. 2005) ("The Government bears the burden of proving relevant conduct by a preponderance of the evidence."); *United States v. Catone*, 769 F.3d 866, 876 (4th Cir. 2014) ("The government must prove the amount of loss by a preponderance of the evidence."); *United States v. Shivers*, 56 F.4th 320, 325 (4th Cir. 2022) ("The government bears the burden of proving the facts necessary to establish the applicability of [a sentencing] enhancement by the preponderance of the evidence.") (internal quotations omitted).

Title 18 U.S.C. § 1347, "makes it a crime to 'knowingly and willfully execute, or attempt to execute, a scheme or artifice . . . to defraud any health care benefit program.'" *United States v. Elfenbein*, 144 F.4th 551, 560 (4th Cir. 2025) (cleaned up and quoting 18 U.S.C. § 1347(a), -(1)); *see also United States v. Joyner*, 187 F.4th 84, 109 (4th Cir. 2026). "There are many ways to commit this crime." *Id*. For instance, "[t]he statute forbids people to 'obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.'" *Id*. (quoting 18 U.S.C. § 1347(a)(2)). The statute does not "define 'defraud' or 'fraudulent.'" *Id*. Our Court of Appeals has held, however, "that Congress in § 1347 incorporated the 'common-law understanding of fraud.'"

*Id*. (quoting *United States v. Perry*, 757 F.3d 166, 176 (4th Cir. 2014)). "This concept 'includes acts taken to conceal, create a false impression, mislead, or otherwise deceive in order to prevent the other party from acquiring material information.'" *Id*. (quoting *Perry*, 757 F.3d at 176). In essence, "if someone knowingly submits false or misleading claims for payment to a healthcare program," that conduct violates § 1347." *Id*. (citing *United States v. McLean*, 715 F.3d 129, 137-38 (4th Cir. 2013)); *see also United States v. Davis*, No. 25-4093, 2026 WL 1122193 at *3 (4th Cir. Apr. 24, 2026) ("There's only fraud if the bills submitted to Medicaid reflect false or misleading claims for payment.") (internal citations and quotations omitted).

As previously noted, the Government contends the add-on claims for smoking and obesity counseling are fraudulent because they were not actually rendered. It attempts to prove the unrendered -- and thus fraudulent -- nature of these claims in two ways. First, the cloned-note theory: Where the patient EMRs contain the same templated language regarding smoking or obesity counseling without any individualized, patient-specific assessment, the service was not actually provided. Second, the no-note theory: Where the patient EMR either (1) demonstrates an office visit occurred but contains no note indicating the smoking or obesity counseling was provided, or (2) lacked record of an office visit on the date the add-on claim for smoking or obesity counseling was billed. The Court addresses each theory in turn.

**1. Unrendered Services: Cloned-Note Theory**

The Government maintains "[t]he cloned notes for add-on services that were placed in Holistic's patients' medical records are evidence that, when considered with testimony, other documentation, and [Mr.] Blankenship's own admission, prove the services were not rendered as claimed." [ECF 244 at 6]. But the Government has not provided any evidence beyond the patient records themselves to support its assertion. For instance, though it contends "[m]ultiple patient

witnesses provided statements to law enforcement and were prepared to testify that the services either did not occur at all, or did not occur at the level or frequency claimed," the Government has not presented any such evidence to the Court, despite the numerous opportunities it has been given to adequately support its asserted loss amount. [*Id.*].

The Government also appears to contend Mr. Blankenship's admission to the offenses of conviction is indicative of his fraudulent conduct before and after those offenses occurred. In other words, the Government asserts because Mr. Blankenship admitted he fraudulently billed for unrendered services while no qualified provider was in the office during the three-day Hilton Head trip in October 2020, the remainder of his billed claims for add-on services from January 2018 through January 2021 are also fraudulent. The contention amounts to nothing more than an improper propensity argument. Indeed, the Government is essentially requesting the Court conclude all add-on services supported by a cloned note over a three-year period were not actually provided given Mr. Blankenship's admission to similar (stretching the word beyond its linguistic limits) conduct during a finite period. But to do so would require findings on an evidentiary record that does not exist and from which no such inference would be either permissible or reasonable.

Moreover, the assertion is fundamentally flawed beyond its mere conjecture. The fraudulent nature of the Beach Trip claims does not arise from the presence of a cloned note in the relevant patient records. Rather, there is *actual evidence* those claimed services were not rendered given that no nurse practitioner was in the office on the dates the add-on services were purportedly provided. The Government has adduced no such evidence in support of its cloned-note theory in efforts to demonstrate the add-on services were not rendered by Mr. Blankenship or another Holistic nurse practitioner. The same is likewise true for its no-note theory. In fact, the Government

does not dispute a qualified provider was present in the office when the add-on claims were billed. Rather, it relies on the fact that because Mr. Blankenship admitted to fraudulently billing the same add-on services during the Hilton Head trip, he did so on nearly every other occasion those same claims were billed. The Court declines to take this speculative, inferential leap.

Reduced to its essence, the Government merely relies on the repeated presence of the cloned notes to support its contention that the smoking and obesity counseling claims billed therefrom were fraudulent. That is a position (1) its own expert rejected at the evidentiary hearing, and (2) the AMA appears to condemn or at least not condone. First, though Dr. McCann described the use of cloned notes as "problematic" and inappropriate given their lack of individualized, "patient-centric information," [ECF 210 at 20:4-21:7] he admitted there was no specific policy that prescribes the use of cloned notes "in and of itself" as inherently fraudulent. [*Id*. at 63:5-8]. Instead, he testified the use of cloned notes is more indicative of "abuse," absent some other indication of fraud, such as providing "obesity counseling on someone who isn't obese or smoking counseling on someone who doesn't smoke[7]," or not providing the service as claimed. [*Id*. at 59:9-16; *see also id*. at 48:25-49:12, 53:3-19].

Second, as Mr. Blankenship points out, the AMA has explicitly stated "[t]here is no federal regulation prohibiting the use of the copy and paste function (CPF)," also referred to as "cloning," "within the electronic health record (EHR)." [ECF 206-11 at 1; *see also* ECF 206-12 ("Our American Medical Association believes that the use of time-saving features, such as cloning, templates, macros, 'pull forward technology', auto-population and identical language in EMRs,

[7] Though the Government initially asserted the add-on claims were fraudulent for this very reason, it has since abandoned that position in exchange for the cloned-note and no-note theories raised in its recent submissions. Presumably because the vast majority of the patient records refute the lack of medical necessity assertion.

by itself is not an indication of inaccurate documentation or incorrect coding.")]. The AMA goes so far as to describe the cloning function as a "valuable time-saving tool[ ]" when used properly to "ensure [the] copied/pasted information is accurate, up-to-date, relevant to the current encounter, and in compliance with any organizational policies." [*Id.*].

At bottom, the burden rests with the Government to prove by a preponderance that the add-on claims it seeks to attribute to Mr. Blankenship as part of his purported scheme to defraud are, in fact, fraudulent inasmuch as those services were not rendered. The mere presence of repeated cloned notes in the patient records, absent further indicia of fraud, fails to satisfy that burden. Indeed, without further evidence that Mr. Blankenship did not provide the services encompassed by the add-on claims, the cloned notes alone amount to nothing more than careless documentation, not fraud. *See Davis*, 2026 WL 1122193, at *3 (explaining "Medicaid fraud isn't concerned with internal timekeeping" or "treatment records" containing "false or inaccurate information," inasmuch as "[t]here's only fraud if the bills submitted to Medicaid reflect 'false or misleading claims for payment.'"). Accordingly, inasmuch as the Government has failed to demonstrate the add-on claims encompassed by its cloned-note theory are fraudulent, those claims are not attributable to Mr. Blankenship as relevant conduct. They will thus be excluded from the Court's loss calculation.[8]

**2. Unrendered Services: No-Note Theory**

The Government next seeks to attribute the no-note claims for add-on services to Mr. Blankenship in calculating the applicable loss amount. As previously explained, the first category of no-note claims consists of patients whose EMRs lack a note indicating the smoking or

[8] According to Mr. Blankenship, the Government's alleged loss stemming from its cloned-note theory amounts to approximately $350,129.42 of its asserted $416,210.83 add-on claims total. [ECF 239 at 4].

obesity counseling was provided during the office visit for which the claims were billed. The Government asserts the missing notes prove the add-on services were not provided. The second category of no-note claims consists of patients whose EMRs lack a note indicating an office visit occurred on the date the add-on services were billed. In other words, there is no record the patient was seen by a provider on the date Holistic billed for the add-on services that were purportedly rendered. The Government asserts the missing office visit notation in the patient EMRs demonstrates Mr. Blankenship fraudulently billed for add-on services that were not rendered.

Mr. Blankenship rejects these assertions. He contends the Government's no-note theory is insufficient to prove the add-on services billed were not actually rendered. But even if the no-note theory is indicative of fraud, he asserts the corresponding fee tickets for many of these visits corroborate the add-on services were provided, despite a lack of specific reference to those services in the patients' EMRs.

Contrary to Mr. Blankenship's assertion, the Government maintains the absence of notes in the patient records -- in conjunction with Mr. Blankenship's admission to fraudulently billing for unrendered services over a three-day period -- demonstrates the services encompassed by no-note claims were likewise not provided. This is the same line of speculative reasoning earlier addressed and rejected. Mr. Blankenship's narrow admission to the offenses of conviction cannot -- in isolation -- reasonably be extrapolated beyond their general classification of wrongdoing and temporal scope to establish the systematic and pervasive pattern of fraudulent billing the Government insists was occurring. In other words, three-days of fraudulent billing for unrendered services fails to establish an ongoing, three-year scheme to defraud that bears.

While the Government *alleged* an ongoing conspiracy to defraud Medicaid from January 4, 2018, through July 15, 2021, by the fraudulent submission of add-on claims, it has yet

to offer sufficient proof to demonstrate those claims were in fact fraudulent. The Government categorically asserts that, had this case gone to trial, it would have (1) "presented multiple witnesses" to establish the add-on services billed "either did not occur at all, or did not occur at the level or frequency claimed," [ECF 244 at 6], and (2) "presented evidence that [Mr. Blankenship] admitted to adding items to fee tickets on a regular basis." [ECF 227 at 7] That may be true. But it offered a plea deal Mr. Blankenship accepted. It may have been offered without foresight -- or to forestall an adversarial testing of its proof with a jury of Mr. Blankenship's peers in the box -- or for some other reason not yet identified. The point matters not. What is certain is that the Government has not offered testimonial or documentary proof by a preponderance to support its asserted loss amount.

Absent the plea deal, the Government may have attempted to prosecute the wide-ranging criminal misconduct it now seeks to prove by an unadorned document-dump at sentencing. There is a reason our system places the evidentiary burden on the Government for either adjudicating guilt or ratcheting up a sentencing range. Felony status almost always scars one's name for life and even a night in prison is an extremely serious penalty for those who value the rights and freedoms our Constitution enshrines.

Mr. Blankenship may possibly have been engaged in a long-term fraud to enrich the medical practice and himself in violation of federal law. That serious misconduct, however, requires more than simply missing notes in patient records that might just as soon indicate nothing more than careless or negligent charting. *See United States v. Ganji*, 880 F.3d 760, 777 (5th Cir. 2018) (explaining defendant's conviction was for healthcare fraud, "not patient negligence, keeping subpar files, or haphazardly conducting h[is] business;" thus, evidence of his "participation in lax practices" was insufficient to sustain his conviction under 18 U.S.C. § 1347.)

It should be emphasized that the Court acknowledges that claims for services lacking corroborating documentation in the patient record may -- when coupled with an *established pattern* of phantom billing or fabricated records -- constitute compelling, circumstantial evidence that the underlying services were not rendered. *See, e.g., McLean*, 715 F.3d at 138 (recognizing defendant's "pattern of overstating blockage by a wide margin and placing unnecessary stents in a large number of cases was direct evidence of a fraudulent scheme."). But that comparable pattern is conspicuously absent from this record, and Mr. Blankenship's admission to the offenses of conviction does not establish it. Accordingly, inasmuch as the Government has failed to demonstrate by a preponderance that the add-on claims encompassed by its no-note theory are fraudulent, those claims are not attributable to Mr. Blankenship as relevant conduct. They will thus be excluded from the Court's loss amount calculation.[9]

***B. Claims Submitted by Other Holistic Practitioners***

The Court also requested briefing on whether the $137,543.23 in alleged fraudulent claims for services rendered by providers other than Mr. Blankenship are nonetheless attributable to him under U.S.S.G. § 1B1.3(a)(1)(B). It appears, however, that those claims are encompassed in the add-on claims the Court has now concluded it will not consider in its calculation of the appropriate loss amount. The issue is thus deemed moot unless indicated otherwise by the parties.

***C. Remaining Loss Amount***

After exclusion of the add-on claims, the actual loss amount reduces to the $21,300.66 in claims submitted during the Hilton Head trip, including the (1) $7,515.96 in billed claims for unrendered services when no qualified practitioner was present, and (2) $13,784.70 in

[9] According to Mr. Blankenship, the Government's alleged loss stemming from its no-note theory amounts to approximately $67,195.48 of its asserted $416,210.83 add-on claims total. [ECF 239 at 4].

claims billed for Suboxone prescriptions called in on Mr. Blankenship's behalf. A dispute remains respecting the latter category. [*See* ECF 196-1]. Mr. Blankenship contends the Suboxone claims should be excluded inasmuch as the Controlled Substance Act and its implementing regulations authorize prescriptions for Schedule III controlled substances, like Suboxone, to be (1) issued verbally to include up to 6 months of refills, and (2) communicated to a pharmacist by the practitioner's agent. [*Id.* at 2, 4]. He thus maintains those prescriptions were not fraudulent.

The Government disagrees. It maintains (1) none of the patients at issue were provided "with advanced prescriptions or refills that would have meant no office visit . . . was necessary during his beach trip" before the prescription was filled, (2) "someone who is not a DEA registrant cannot act as an agent and call in a prescription unless a DEA registrant has first issued a prescription based on a medical determination of necessity," which was not done given Mr. Blankenship was out of state, and (3) "[a]ny new prescription, even one continuing prior dosage amounts, requires an individualized assessment of the patient at the time . . . the prescription is issued," which, again, did not occur due to Mr. Blankenship's absence. [*Id.* at 11].

Given the outstanding dispute, the parties are **DIRECTED** to submit cross-briefs on the legality and/or fraudulent nature of the Suboxone prescription claims, together with any necessary documentation or evidence in support of their respective positions, on or before **December 4, 2026**, with any responses due by **December 11, 2026**. Upon disposition of this issue, the Court will direct the PSR be amended in accord with the entirety of the Court's rulings.

**III.**

Based on the foregoing discussion, the Court **SUSTAINS** Mr. Blankenship's objection to the inclusion of the add-on claims in the loss amount calculation.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and to any unrepresented party.

ENTER: November 24, 2026

Frank W. Volk
Chief United States District Judge